UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| JAYQUAN BROWN, | : |
| | : |
| Plaintiff, | : |
| | : |
| - against - | : |
| | : |
| NEW YORK CITY DEPARTMENT | |
| OF EDUCATION; AND JOSHUA LAUB, | : |
| | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 12, 2012

12 Civ. 0035 (PAC)

<u>OPINION & ORDER</u>

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Jayquan Brown ("Brown" or "Plaintiff") performed services at Banana Kelly High School ("Banana Kelly") from October 2007 through December 23, 2010. He claims that the Department of Education ("DOE"), which manages Banana Kelly, failed to pay him minimum wage and overtime in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq.; and claims that Banana Kelly Principal Joshua Laub, in his personal capacity, is liable under the New York Labor Law, N.Y. Lab. Law §§ 650 et seq. The parties cross-move for summary judgment. For the reasons discussed below, the Court denies Plaintiff's motion for summary judgment, grants Defendant summary judgment on the FLSA claim, and declines to exercise supplemental jurisdiction over Plaintiff's remaining New York Labor Law claim.

<b>B<small>ACKGROUND</small></b>

Banana Kelly is a New York City public high school in managed by DOE. (DOE 56.1 ¶ 2.) At all times relevant to this action, Joshua Laub served as Principal of Banana Kelly; Dean Daniel Jerome was the Director of Student Life. (<u>Id.</u> ¶¶ 4, 9.) In January 2006, Brown graduated

1

from the New School for Arts and Sciences, a high school that shared space with Banana Kelly. (Id. ¶ 21.)  After graduation, Brown maintained ties with Banana Kelly and occasionally came in to visit former teachers.  (Id. ¶ 23.)  In October 2007, when Plaintiff expressed an interest in mentoring students, Jerome offered Plaintiff the opportunity to do so at Banana Kelly.  (Id. ¶¶ 24-26.)  Neither Brown nor Jerome raised the issue of compensation at this time, and neither discussed Brown's employee status.  (Id. ¶¶ 32, 34.)  No one interviewed Brown about his background or qualifications.  (Id. ¶ 30.)  Laub described the position as a "volunteer internship," which Plaintiff accepted.  (Brown 56.1 ¶ 15.)

Thereafter, Brown went to Banana Kelly and continued at the school for more than three years, finally leaving in December 23, 2010.  (DOE 56.1 ¶ 2.)  During his time at the school, with minor exceptions, Plaintiff reported five days a week throughout the academic year. (Brown 56.1 ¶ 85.)  He started at approximately 9:30 A.M. and stayed late to help, leaving anywhere between 4:00 P.M. to 6:00 P.M., and occasionally later.  (Welikson Dec. Ex. C Brown Dep. 147:20 to 148:17, 152:12-22.)[1]  Beginning in January 2010, Plaintiff assisted with a Saturday program at Banana Kelly that was designed to help students prepare for exams and classes.  (Brown 56.1 ¶¶ 80, 86.)  At these Saturday sessions, Plaintiff organized student arrivals, took attendance, performed office tasks and ensured that students reported to their assigned teacher.  (Id.)  Brown provided services during the 2009 summer session as well.  (Id. ¶ 88.)

Brown can point to no evidence that he ever submitted to the normal, legal requirements for employment by the Department of Education: application, interview, background check, job classification, and assignment.  Instead, Plaintiff argues that he was an employee at Banana

---

[1] In 2009, Plaintiff maintained shorter hours, and left Banana Kelly prior to 3PM dismissal to arrive on time to a security company at which Plaintiff worked the evening shift.  (Id. at 156:10-157:13.)

Kelly, not a volunteer, because he expected compensation for his services.  (Brown 56.1 ¶ 56.) Plaintiff occasionally asked Jerome and Laub for money and in response, received small amounts of cash, meals and Metrocards.  (Id. ¶¶ 60-62.)  Plaintiff's requests precipitated conversations in which Plaintiff asked to be put on the payroll and given a paid position.  (Id. ¶¶ 55, 63.)  Jerome and Laub responded by encouraging Plaintiff to search for positions outside of Banana Kelly. (Id. ¶ 55.)  Although Laub told Plaintiff that there was not enough money in the budget to pay him, (id. ¶ 53), according to Plaintiff, Laub promised that he would attempt to search the budget for the funding.  (Okoronkwo Dec. Ex. 13, Brown Dep. at 188:4-20.)  Further, Plaintiff argues that he was led to believe that Banana Kelly would offer him a stipend.  In 2010, Laub informed that I-Team that the administration was applying for a $170,000 grant to support the I-team, perhaps as a "stipend" for the interns.  (Id. ¶¶ 57, 58.)  The school never received the funding and Brown was never placed on the payroll.

Plaintiff believed that while at Banana Kelly, he was a part of its Intervention Team ("I-Team").   Principal Laub and Dean Jerome tasked the I-team which with student conflict resolution and enforcement of school rules.   (Id. ¶¶ 10-13, 16.)   The Team "intervene[d], between teachers and kids, having trouble in the classroom, and [tried] to bring them together and work together in a comfortable environment."  (Id. ¶ 11.)  As part of conflict resolution, the I-team often held mediation sessions.   (Id. ¶ 17.)   The I-team also greeted students in the morning, monitored the hallways, supervised students during lunch, escorted students back to their classrooms, and supervised dismissal.  (Id. ¶ 15.)  Plaintiff contends that he was presented to students, parents and teachers as an I-team "staff member."  (Brown 56.1 ¶ 21.)  He performed the same tasks, including monitoring students during lunch and dismissal, (DOE 56.1 ¶ 38), escorting disruptive students from their classrooms to Jerome's office (id. ¶ 39), conducting

mediations (id. ¶ 40) and breaking up verbal and physical fights between students (id.). Significantly, however, while the rest of the members of the I-team were paid, Plaintiff was not. (Id. ¶ 33.)

Despite their conversations, Jerome did not offer Plaintiff mentoring opportunities when Brown first started.  (Brown 56.1 ¶ 52.)  Plaintiff performed administrative tasks for the school, including answering phones in Jerome's office, printing out students' schedules, distributing progress reports and report cards, and determining students' emergency contact information. (DOE 56.1 ¶ 41.)   Brown also assisted with lunch detention, lunch duty, dismissals and monitoring hallways.  (Id. ¶¶ 38-39; Brown 56.1 ¶ 26.)  Brown provided classroom coverage for teachers (Brown 56.1 ¶ 28) and performed miscellaneous tasks that included escorting students from one area of the school to another and unlocking classroom and bathroom doors.  (Id. ¶ 46.) After school, Brown fielded calls from Banana Kelly's parents and students about disciplinary problems.  (Id. ¶ 76.)  Starting in 2010, Brown was allowed to mentor a small group of students. (Brown 56.1 ¶ 23.)   Plaintiff maintains that Defendants used his services to combat staffing challenges at Banana Kelly.  (Brown 56.1 ¶ 5, 9.)

While at Banana Kelly, Plaintiff applied for a variety of positions outside of the school, including as a school aide, at a school cafeteria, and at Building Educated Leaders for Life, an afterschool program.  (DOE 56.1 ¶ 65, 73, 88.)  Plaintiff informed others at Banana Kelly that he was searching for positions and requested letters of recommendation.  (Id. ¶¶ 67, 70.)  On December 23, 2010, Principal Laub met with Brown and explained that Brown could no longer come to Banana Kelly.  (Id. ¶¶ 94-95.)  At the time, the Special Commissioner of Investigation for the New York City School District ("SCI") was investigating Plaintiff for having made inappropriate comments made to a freshmen girl, and instructed Laub not to allow Plaintiff back

to Banana Kelly.   (<u>Id.</u> ¶¶ 95-97.)   Plaintiff left and terminated his association with Banana Kelly.[2]

## DISCUSSION

### A.   SUMMARY JUDGMENT

Summary judgment may be granted where "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995).

### B.   DOE's LIABILITY UNDER FLSA

The FLSA is a remedial act; and its exemptions must be narrowly construed against the employer seeking to assert them.  <u>Coke v. Long Island Care at Home, Ltd.</u>, 376 F.3d 118, 123 (2d Cir. 2004) (citing <u>Arnold v. Ben Kanowsky, Inc.</u>, 361 U.S. 388, 392 (1960)).  An employer carries the burden of proving that an employee falls within an exemption.  <u>Id.</u> (citing <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 196-97 (1974)).  Whether an individual is a volunteer, as opposed to an employee, is a question of law for the court to decide.  <u>Purdham v. Fairfax County</u>

---

[2] Plaintiff alleges that Laub had spoken with Brown earlier in November 2010 about leaving the school, but called Brown to return to the school, which Brown did until December 23, 2010.  (Brown 56.1 Counterstatement ¶ 95.) This dispute is not relevant to the FLSA case.

<u>School Board</u>, 637 F.3d 421, 428 (4th Cir. 2011); <u>Cleveland v. City of Elmendorf Texas</u>, 388

F.3d 522, 526 (5th Cir. 2004); <u>Todaro</u>, 40 F. Supp. 226, 228 (D.N.J. 1999).[3]

      In 1985, Congress amended the FLSA to exclude "volunteers" from its definition of

"employee."  Congress' intent was "to make clear that persons performing volunteer services for

state and local governments should not be regarded as 'employees' under the statute."  S. Rep.

No. 99-159, at 14 (1985).  This volunteer exemption is contained in 29 U.S.C. § 203(e)(4)(A),

which provides:

> The term 'employee' does not include any individual who volunteers to perform services
> for a public agency which is a State, a political subdivision of a State, or an interstate
> governmental agency, if (i) the individual receives no compensation or is paid expenses,
> reasonable benefits, or a nominal fee to perform the services for which the individual
> volunteered; and (ii) such services are not the same type of services which the individual
> is employed to perform for such public agency.

      The FLSA does not define "volunteer."   Instead, in 1987, the Department of Labor

defined "volunteer," and articulated two requirements: first the individual must perform hours

for "civic, charitable, or humanitarian reasons" and second, the individual must do so "without

promise, expectation or receipt of compensation for services rendered."  29 C.F.R. § 553.101(a).

This regulation should be interpreted in light of the Supreme Court's definition of "volunteer" as

one who, "'without promise or expectation of compensation, but solely for his personal purpose

or pleasure, worked in activities carried on by other persons either for their pleasure or for

profit.'"  <u>Tony & Susan Alamo Foundation</u>, 471 U.S. 290, 295 (1985) (quoting <u>Walling v.</u>

---

[3] The Second Circuit has not yet analyzed the FLSA's volunteer exemption under 29 U.S.C. § 203(e)(4)(A), nor
applied the Administrator's definition of "volunteer" in 29 C.F.R. § 553.101(a), <u>see</u> <u>infra</u>.  But both parties apply the
regulation's criteria, and we find that courts in other circuits that have addressed the volunteer exemption provide
useful guidance.

Portland Terminal Co., 330 U.S. 148, 153 (1947)).[4]  Some examples of activities that would fall within the exemption include helping at a sheltered workshop, hospital, nursing home, school library or cafeteria, or participating in "charitable or educational programs."   29 C.F.R. 553.104(b).   While Brown makes much of his different assignments at Banana Kelly, his changing responsibilities, and whether his work is mentoring or non-mentoring, these distinctions are irrelevant under the statutory and regulatory scheme.   "There are no limitations or restrictions imposed by the FLSA on the types of services which private individuals may volunteer to perform for public agencies." 29 C.F.R. 553.104(a).  Further, the fact that Brown performed so many different types of tasks suggests that he was a volunteer.  If Brown held a position as an employee, his tasks would be limited to those in his job classification.

Whether one is a volunteer is to be determined "in a common-sense manner, which takes into account the totality of the circumstances surrounding the relationship between the individual providing services and the entity for which the services are provided."  Purdham, 637 F.3d at 428; City of Elmendorf, 388 F.3d at 528; Todaro, 40 F. Supp. 2d at 230.  Accordingly, courts should review "the objective facts surrounding the services performed to determine whether the totality of the circumstances establish volunteer status, or whether, instead, the facts and circumstances, objectively viewed, are rationally indicative of employee status."  Purdham, 637 F.3d at 428.

The Court first considers whether Brown performed the tasks at Banana Kelly for "civic, charitable, or humanitarian reasons," pursuant to 553.101(a).  One is a volunteer, if motivated by an altruistic sense of civic duty, see Krause, 969 F. Supp. at 276, as opposed to the expectation of

---

[4] The major difference is that the Court would still consider an individual as a volunteer even if he does so for his own "personal purposes" while under the regulation, this motivation would remove an individual from volunteer status.

compensation, see Rodriguez, 866 F. Supp. at 1019.  When the situation is one of mixed motives, "the regulatory definition does not require that the individual be exclusively, or even predominantly, motivated by 'civic, charitable or humanitarian reasons.  Rather, what is required is that the individual must be motivated by civic, charitable or humanitarian reasons, at least in part."  Purdham, 637 F.3d at 429 (citing Todaro, 40 F. Supp. at 230); see also Benshoff v. City of Virginia Beach, 9 F. Supp. 2d 610, 623 (E.D. Va. 1998) (finding that firefighters were volunteers when motivated primarily, but not exclusively, by civic, charitable and humanitarian concerns).  Here, Brown accepted Jerome's offer to mentor, in part, because he wanted "[s]omeone . . . to stand up, and make a change, and show the kids that we do care."  (Welikson Dec. Ex. C, Brown Dep. at 35:21-22.)  He felt that the school needed the change because in his experience as a student, "nobody cared" (id. 35:14-17).  This motivation remained unchanged as Brown started performing non-mentorship tasks.  Brown testified that he helped with lunch duty, dismissals and escorting students despite his displeasure with being asked because he wanted to be a "team player" and that he "want[ed] to help and [he] care[d]."  (38:14-39:5.)  He felt obligated because he did not want to "let[ ] the school down."  (id. at 150:20-22.)  These statements show a continued civic and charitable intent to improve the environment at Banana Kelly.  At the same time, Brown testified that he worked because he believed ("hoped") that money was forthcoming.  (Okoronkwo Dec. Ex. 13 Brown Dep. 231:18-19).  Accepting Brown's acknowledgements, the Court turns to whether, in this mixed motive case, Brown acted at least in part, by the proper humanitarian concerns.  See Purdham, 637 F.3d at 429.  Plaintiff's testimony shows that his actions at Banana Kelly, had their source, at least in part, in his concern for what would become of students if he did not show up, and was thus properly motivated.[5]

---

[5] Brown's other motivations for mentoring included building his resume (Okoronkwo Dec. Ex. 13, Brown Dep.

The Court turns to whether there was a "promise, expectation or receipt of compensation for services rendered."  29 C.F.R. § 553.101(a).  First, Plaintiff was not "compensated" for his services.  The small sums of money that Principal Laub and Dean Jerome gave to Plaintiff out-of-pocket,[6] along with occasional meals and Metrocards, did not constitute such "compensation." Volunteers may receive "expenses, reasonable benefits, [or] a nominal fee" from the public agency for which they work without losing their status as bona fide volunteers.  29 C.F.R. § 553.106(a).  Reasonable "expenses" include reimbursement for the cost of meals and transportation expenses . . . ."  29 C.F.R. § 553.106(b).  The Metrocards and occasional breakfasts or lunches that Jerome received are exactly the type of "expenses" provided in the regulation.

Circumstances do not suggest that the money was offered as an under-the-table inducement to coerce or compel Brown to work for the purpose of avoiding minimum wage

---

33:13-23), and learning mentorship skills from Mr. Jerome (id. 44:18-25-45:7).  These motivations, entirely understandable, are not fatal to a determination that Brown is a volunteer, rather than an employee.  The Supreme Court has included within its definition of volunteer those who perform hours solely for one's own "personal purpose."  Tony & Susan Alamo Foundation, 471 U.S. 290, 295 (1985).  This definition has been interpreted to include volunteering to "acquire employment contracts, gain experience, or obtain school credit."  Todaro, 40 F. Supp. 2d at 230.

[6] Principal Laub admitted that over the course of years in which Brown worked at Banana Kelly, he gave Brown amounts between $25 and $40 out of his pocket around three or four times "in appreciation of his work." (Okoronkwo Dec. Ex. 4 Laub Dep. at 184:7-19; 185:10-12.)  Similarly, Dean Jerome typically gave Brown metro cards or some cash in response to Brown's requests for money to cover transportation and meals.  (Okoronkwo Dec. Ex. 5, Jerome Dep. 39:11-21.)  Brown asserts that in either 2009 or 2010 Mr. Jerome gave him $60 every week, between ten and twenty times, and told him each time to "keep up the hard work" and "see you Saturday." (Okoronkwo Dec. Ex. 13 Brown Dep. 236:7-13, 18-22, 237:17-238:7.)  Mr. Jerome testified that he did not recall regularly paying Brown, (Okoronkwo Dec. Ex. 5, Jerome Dep. at 42:15-21), but for the purposes of analyzing Defendant's motion for summary judgment, we will consider Plaintiff's version of the facts as accurate.  There is no evidence that the Department of Education ever advanced any money to Brown.

laws.[7]  There was no evidence that the money was connected to or varied based on a particular number of hours worked.   Jerome's comments to "keep up the hard work" and "[s]ee you Saturday" are not to the contrary.  (Okoronkwo Dec. Ex. 13 Brown Dep. At 236:18-22.)   The petty cash—amounts between $20 and $60—did not "compensate" Brown for his services. Volunteers may receive a nominal fee that "is not a substitute for compensation and must not be tied to productivity."   29 C.F.R. § 553.106(e); <u>Purdham</u>, 637 F.3d at 434 (finding that a School Board's stipend was a "nominal fee" that did not constitute "compensation" for an unpaid coach's services).   The U.S. Department of Labor Wage and Hour Division has found that a fee is nominal, and not considered compensation, if it does not exceed 20 percent of the market amount paid to a full-time employee.  WH Admin. Op. FLSA2005-51 (Nov. 10, 2005).  The cash that Plaintiff received at most totaled $1,200.   That is less than "nominal"; it is a mere trifle compared to a full-time salary.   The amount that Brown was paid cannot reasonably be understood as compensation.  <u>See</u> 29 C.F.R. § 553.106(f) ("Whether the furnishing . . . benefits, or fees would result in individuals losing their status as volunteers under the FLSA can only be determined by examining the total amount of payments made . . . in the context of the economic realities of the particular situation.").   In fact, Brown admits that he did not know why Jerome or Laub paid him; but did not believe that it was in exchange for his services.  (Okoronkwo Dec. Ex. 13 Brown Dep. at 197:9-10, 198:7-199:2, 238:10-24.)  Jerome testified that Brown's requests for money were out of pocket expenses for food and transportation (Okoronkwo Dec. Ex. 5 Jerome Dep. 39:11-21), not as compensation.  Laub explained that he gave Plaintiff money in appreciation of his work and efforts (Okoronkwo Dec. Ex. 4 Laub Dep. 184:10-12, 185:12-21).

---

[7] The regulation provides: "Individuals shall be considered volunteers only where their services are offered freely and without coercion, direct or implied, from an employer."  29 C.F.R. § 553.101(c).  There is no evidence that Brown was coerced or compelled in any way to work at Banana Kelly.

Plaintiff continued at Banana Kelly even at times when he undisputedly did not receive money from either Laub or Jerome, which covered most of his tenure there.

Brown cannot point to any evidence that he was "promised" compensation.  See 29 C.F.R. § 553.101(a).  Brown admits that while he asked Mr. Jerome several times whether he would get paid (id. at 188:22-25), no one ever told him, either at the time he started (Welikson Dec. Ex. C, Brown Dep. at 44:4-6) or at any time thereafter (Okoronkwo Dec. Ex. 13, Brown Dep. at 189:2-9), that he would actually receive compensation.  He was never told that he would be an employee at Banana Kelly.  (Id. at 43:24-44:1.)  Brown points to Mr. Laub's statement that he would search the school budget for money to pay him.  (Okoronkwo Dec. Ex. 13, Brown Dep. at 188:4-20.)[8]  But a promise to look for money is not a promise of compensation.  Further, the clear implication of needing to "search the budget" is that money is not available for Brown's employment.  Plaintiff's expectation that the search for money to fund his activities would be fruitful became more remote and less reasonable with each month that passed without news from Mr. Laub.  See Todaro, 40 F. Supp. 2d at 232 (D.N.J. 1999) (holding that the township's "occasional statements" that they would "look into matters" or comments that "we have to do something about this" did not substantiate any expectation of progress when the officers were faced with objective indicia to the contrary).

Finally, Brown did not have a reasonable expectation of compensation.  See 29 C.F.R. § 553.101(a).  Expectation cannot be entirely subjective—otherwise, volunteers could wish themselves into a paying job.  Further, the regulatory definition that volunteers are not motivated by an "expectation of . . . compensation" incorporates a standard of reasonableness.  Todaro, 40

---

[8] Plaintiff's opposition papers argue that Laub repeatedly promised Plaintiff that he would search the budget, but Plaintiff's own deposition testimony does not support the notion that Laub said this more than once.

F. Supp. 2d at 231.  One who performs in the face of a stated policy that he will not be paid should not be able to convert one's own status by "unreasonably insisting that he has a subjective expectation of receiving wages. . . ."  Id. at 230-31; see Purdham, 637 F.3d at 429 (endorsing a totality-of-the-circumstances approach as supported by objective facts to determine volunteer status); Cleveland v. City of Elmendorf, 388 F.3d at 528 (same).  Here, the evidentiary record cannot support a reasonable expectation of compensation.  Brown could not recall whether he expected payment for his services.  (Welikson Dec. Ex. C, Brown Dep. at 39:16-21; 43:9-13.)  Nor did he ask when he first accepted the offer to start.   (Id. at 39:22-25; 43:14-15.)  Nonetheless, Brown believed that he would get paid based on his "hard work . . . dedication and commitment . . . ."  (Okoronkwo Dec. Ex. 13, Brown Dep. at 189:10-14.)  Volunteers can work hard as well, so the fact of Plaintiff's "hard work," by itself, does not provide a reasonable basis to support an expectation of compensation.  Many bona fide volunteers work hard and commit themselves to agencies in need, and doing so is fully consistent with the spirit of volunteerism.

Brown also argues that he worked at Banana Kelly in anticipation of being promoted to a paid position.  It is not at all clear that the expectation of gaining future employment after a period of service qualifies as "expectation of . . . [current] compensation" under the Administrator's regulation.[9]  The Court need not resolve this issue because, in the circumstances here, Plaintiff's expectation in a paid position was unreasonable as a matter of law.  When

[9] In its commentary to implementing the FLSA's volunteer exemption, the Department of Labor agreed, in principle "that the possibility of future employment does not in itself affect the status of otherwise bona fide volunteers."  It also noted, however, that where "the volunteers expect or anticipate future employment after a period of 'volunteer' service, such conditions raise a question as to whether such individuals are bona fide volunteers . . . ."  52 Fed. Reg. 2012 (Section 553.104 Private individuals who volunteer services to public agencies).  A court in the Southern District of Texas found that a patrol officer who performed unpaid hours pursuant to an explicit agreement allowing him to maintain concurrent paid employment as a road-construction flagmen received "compensation" for his officer duties, but that has little bearing on whether the possibility of future employment similarly qualifies as compensation.  Rodriguez, 866 F. Supp. at 1018.

Brown asked about paid positions at Banana Kelly, Laub told him there was not a paid position for him at the school (Okoronkwo Dec. Ex. 4 Laub Dep. at 141:18-19, 142:9-11), that Laub's staffing practice was to hire college graduates or attendees, which Brown was not (id. at 141:22-142:2), encouraged Brown to apply for positions outside of Banana Kelly, (id. at 185:8-14; 21:24), and brought postings for available school aid positions at other schools to Brown's attention (id. at 76:3-8).  On one occasion, Laub wrote Brown a letter of recommendation for a school aide position at Lehman.  (id. at 169:4-18.)  Jerome similarly conveyed, on multiple occassions, that there were no openings at the school (Welikson Dec. Ex. E, Jerome Dep. at 61:8-62:3).  Jerome also encouraged Brown to apply for school aide positions at other schools. (id. at 55:18-56:19.)  Although Laub had discussed with Jerome the possibility of hiring Brown for a part-time, paid position a few times in 2010 (Okoronkwo Dec. Ex. 4 Laub Dep. 1539:-154:1), there is no evidence that these comments were shared with Brown; or led him to believe he would get hired.  Further, Jerome testified that when he became concerned that Brown spent too many hours at Banana Kelly, he told Brown to reduce his hours so that he could secure employment elsewhere.  (Welikson Dec. Ex. E, Jerome Dep. at 62:22-63:14.)  These statements quash any claim of a reasonable expectation of a paid position.

Plaintiff also asserts that he expected compensation in the form of a stipend from an anticipated grant to the Intervention team, of which he was a member.  This claim must be rejected because the grant never materialized.  And even if it did, it would not change the result. Volunteers may be given stipends that (1) are not a substitute for compensation, (2) are not tied to productivity and (3) are nominal[10] in the context of the economic realities of the particular

---

[10] As previously indicated, payments which do not exceed 20% of the market amount are considered to be nominal. Brown was paid less than $1500 over a three year period.  This is surely nominal.

situation.  See Purdham, 637 F.3d 421, 434 (4th Cir. 2011).  Therefore the fact that an individual may be motivated by the receipt of such a permissible benefit does not alter their status from a volunteer to an employee.  See id.; Todaro, 40 F. Supp. 2d at 232.  Jerome admits that he openly discussed the goal of the grant application: to raise money for the Intervention team.  (id. at 90:8-15.)  And if the grant were received, which it was not, Jerome said he might use the grant to "have a robust internship program in which we could really support the interns, and maybe a stipend . . . ."  (id. at 92:11-20.)  This is speculation about an event which never occurred; it is not the basis for an expectation of compensation.  There is no evidence that anyone told Brown about the amount of the "stipend," which would have been nominal to offset Plaintiff's expenses.  There is no evidence that Brown was told that the stipend would be contingent on his performance or a certain number of hours worked.  While there was talk of a grant application, it never materialized and all or any predictions for its probable uses–and some of the uses which did not include a stipend for Brown— is too remote and extremely speculative to constitute a basis for FLSA relief.

This case presents a scenario in which Plaintiff knew or reasonably should have known, that he would not be compensated for his services.  He continued to work in the apparent hope that perhaps a paid position might become available.   Cf. Todaro, 40 F. Supp. 2d 226, 232 (finding that unpaid officers were volunteers despite their genuine, but unsubstantiated belief and hope that performing unpaid hours would contribute to restoring their eligibility for benefits).  There is ample evidence that Brown knew and understood, despite his hopes to the contrary, that he would not be compensated.  Brown admitted that he understood that he would not get paid for mentoring.  (Welikson Dec. Ex. C, Brown Dep. 174:12-15.)  No one led Plaintiff to believe that he would get paid for non-mentoring tasks.  Laub testified that he had conversations with

Plaintiff in which he relayed to Brown that he was volunteer and intern.  (Okoronkwo Dec. Ex. 4, Laub Dep. at 139:3-12, 141:6-8, 142:15-17.)   Banana Kelly gave him certificates of appreciation that acknowledged his services as an intern and volunteer (Okoronkwo Dec. Ex. 4 Laub Dep. 165:22-166-7), which Brown accepted without objection (Okoronkwo Dec. Ex. 13 Brown Dep. 194:8-9).  While labels used by the parties do not control the outcome (P. Opp. at 11), the parties' understanding of their arrangement is a relevant factor in the totality-of-circumstances analysis.  See Rodriguez v. Township, 866 F. Supp. 1012, 1020 (S.D. Tex. 1994) (declining to hold that the plaintiff was a volunteer in part because both parties understood their relationship as an employment, rather than volunteer, relationship).

Plaintiff argues that the primary consideration in distinguishing an employee from a volunteer is the identity of the primary recipient of benefits from the relationship, and contends that the Department of Education derived an immediate, and greater benefit from Brown's tenure at the school than did Brown.  (P. Opp. at 11, 13.)  This argument is based on the Department of Labor Wage and Hour Division's Fact Sheet #71, which enumerates six criteria for determining whether an internship or training program qualifies as FLSA-exempt.  By its own terms, it applies only to services provided to "'for-profit' private sector employers," and not to public agencies, which are instead governed by 29 U.S.C. § 203(e)(4)(A)'s volunteer exemption.[11] Plaintiff's analogy to Archie v. Grant Cent. P'ship, 997 F. Supp. 504, 531 (S.D.N.Y. 1998) fails

---

[11] The Department of Labor's commentary on the matter is helpful.  The Department affirmatively elected not to include language in its definition of volunteer that would have taken into account whether the individual, as opposed to the agency, accrued the "primary benefit" and additionally whether such services would have displaced paid work.  52 Fed. Reg. 2012, § 553.101.  The Department noted that this would not have been consistent with the "legislative history and Congressional intent of the 1985 Amendments which sought to recognize existing, historical, and legitimate practices affecting persons who volunteer their services to State and local government agencies."  For example, volunteer firefighters have historically been considered volunteers, despite the fact that their services primarily benefit the public agencies for whom they work.  Id.

for the same reasons, as that case involved a for-profit private employer and the court analyzed the trainee/intern exemption.

## CONCLUSION

The Court finds that Plaintiff is a volunteer, not an employee, as defined by the FLSA. Accordingly, it grants Defendant's summary judgment motion on Plaintiff's FLSA claim, denies Plaintiff's request for declaratory relief pursuant to 28 U.S.C. §§ 2201-02, and damages under 29 U.S.C. §§ 206(a), 207(a), and does not reach the question of a willful violation under 29 U.S.C. § 216(b). In view of the Court's dismissal of Plaintiff's FLSA claim, the Court declines to assert pendent jurisdiction over the New York Labor Law claim pursuant to N.Y. Lab. L. §§ 652 et seq. Those allegations may be presented to a New York State Supreme Court. The Court GRANTS Defendant's motion for summary judgment. The Clerk of Court is directed to enter judgment accordingly.

Dated: New York, New York
      December 12, 2012

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

16